E-FILED
Monday, 17 August, 2009 10:03:57 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ANTHONY L. FLETCHER,
   Plaintiff,

vs.                                                    No. 07-1231

DEATHRIDGE, et. al,
   Defendants

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' motions for summary judgement. [d/e 72, 73, 80].

### I. BACKGROUND

On October 1, 2007, the court conducted a merit review of three complaints filed by the plaintiff in one month's time in the Central District of Illinois. The court noted that the plaintiff had previously accumulated three strikes pursuant to 42 U.S.C. §1983(g) and therefore could not proceed *in forma pauperis* unless he could demonstrate that he was in imminent danger. *See* October 1, 2007 Case Management Order.

The court dismissed all claims but one: that the defendants were deliberately indifferent to the plaintiff's serious medical condition. The plaintiff alleged that severe heat in a transport van and the use of pepper spray caused him to have severe asthma attacks and he had been denied medical attention at the Tazewell County Jail. The court noted that the attachments to the plaintiff's complaint were not very supportive of this allegation, but allowed the plaintiff to proceed. October 1, 2007 Case Management Order, p. 3.

The plaintiff's claim was against 12 defendants including Tazewell County defendants Robert Huston, Earl Helm, Jozef Szadkowski, Richard Brock, Garfield Saylor, Richard Johnson, Paul Malavottie, Dr. Stephen Cullinan and Nurse Renae Alexander. The plaintiff also named United States Marshal Deathridge and Deputy Marshal Jeffery Dale.

### II. FACTS

Dr. Stephen Cullinan says he is the Chief Medical Officer and co-founder of Health Professionals, Ltd. In addition, Dr. Cullinan says he has been the Medical Director and staff physician for a number of county jails in several Midwest states including the Tazewell County Jail. (Def. Mot, Cull. Aff, p. 1). Renee Alexander says she is a nurse who is the site manager at the Tazewell County Jail.

1

Dr. Cullinan says he was notified that a new inmate, the plaintiff, had entered the Tazewell County jail on May 18, 2007. The plaintiff had a medical record from his stay at the McLean County Jail which indicated that the plaintiff had been prescribed a medication to control blood sugar levels. Dr. Cullinan continued the prescription and ordered that the plaintiff be placed on a diabetic diet. In addition, the doctor ordered that the plaintiff "be given Accu Check, the brand name of a medical meter used to determine a patient's blood sugar level." (Def. Mot, Cull. Aff, p. 2).

Nurse Alexander says the plaintiff was given 13 different Accu Checks from his admission to June 10, 2007. (Def. Memo, Alex. Aff, p. 1-2) None of the Accu Check results provided any reason to believe the plaintiff suffered from diabetes, so the doctor discontinued the Accu Checks. (Def. Mot, Cull. Aff, p. 2).

On June 13, 2007, the plaintiff complained to the jail staff nurse that he suffered from asthma and need an inhaler. The nurse noted that the plaintiff spoke in full sentences and his heart sounds were within normal limits. The plaintiff was asked if he would like to be put on the list to see Dr. Cullinan, but the plaintiff simply stared at the nurse and refused to respond. (Def. Memo, Alex. Aff, p. 4).

Dr. Cullinan says he first examined the plaintiff on June 15, 2007. The plaintiff said he was asthmatic and needed an inhaler. The doctor noted there were no outward signs that the plaintiff was in distress and there were no reports from any officers that the plaintiff suffered from asthma. Nonetheless, the doctor noted hat the plaintiff had been given an inhaler while incarcerated at the McLean County Jail.

The doctor then administered a "peak flow meter" test which is used to measure a patient's ability to move air. Dr. Cullinan says the best of three recordings was used for the result and the plaintiff's peak flow was 550. The doctor says a peak flow of 400 and above would be considered normal for a male of the plaintiff's height and weight. Dr. Cullinan says to "aid in his diagnosis," he ordered that the plaintiff was to be given a peak flow test weekly for four weeks to determine if a diagnosis of asthma was appropriate. Dr. Cullinan further ordered that the plaintiff was to be checked if he made any reports of having an asthma attack. (Def. Mot, Cull. Aff, p. 3).

The plaintiff also complained of a skin condition, Eczema, during the visit and was prescribed a cream for treatment. (Def. Mot, Cull. Aff, p. 3) n June 19, 2007, the plaintiff began screaming at the nurse on duty for his skin cream. The plaintiff was disruptive and abusive. Medical records indicate the plaintiff was given his prescription for skin cream throughout June. (Def. Memo, Alex. Aff, p. 6)

On June 22, 2007, nurses attempted to administer a peak flow test on the plaintiff to see if he plaintiff displayed any asthma symptoms. The plaintiff refused the test and said, "Tell the doctor I'll see him in court." (Def. Memo, Alex. Aff, p. 5)

2

On July 3, 2007, the plaintiff said he need an inhaler. Dr. Cullinan says the medical records indicate the plaintiff was not in acute distress. The plaintiff was yelling and speaking in complete sentences. "It was assessed that the Plaintiff was manipulating and the plan was to monitor the plaintiff." (Def. Mot, Cull. Aff, p. 3). Dr. Cullinan also states:

> (the plaintiff) did not complain to me about suffering from asthma at any time after July 3, 2007. People with asthma experience symptoms when the airways tighten, inflame or fill with mucus. Common symptoms of asthma include coughing, especially at night, wheezing, shortness of breath and chest tightness, pain or pressure. The plaintiff presented none of these symptoms. (Def. Mot, Cull. Aff, p. 3)

Nurse Alexander also notes that the plaintiff did not complain to any other medical staff about asthma problems after July 3, 2007. (Def. Mot, Alex. Aff, p. 5) Alexander says another peak flow test was administered on July 14, 2007 to check the plaintiff's breathing ability and the results were within normal limits. (Def. Mot, Alex Aff., p. 5)

Dr. Cullinan prescribed additional medication and treated the plaintiff for skin problems on August 13, 2007 and August 29, 2007. Nurse Alexander says the medical records demonstrate the plaintiff was offered his prescribed medication in August, but the plaintiff refused the treatment.

The doctor also saw the plaintiff on September 21, 2007, to address the plaintiff's complaints concerning his diabetes. The plaintiff had normal blood sugar levels, but the doctor ordered that it be tested on four consecutive days. All results returned normal. (Def. Mot, Cull. Aff, p. 3-4).

Nurse Alexander says Jeff Dale of the United States Marshall Service called the jail on September 25, 2007, after the plaintiff had complained that he was suffering from diabetes. Mr. Dale was inquiring whether the plaintiff had received care and if anyone had checked his blood sugar level. (Def. Memo, Alex. Aff, p. 3). Dale called again on October 1, 2007 to inquire whether the plaintiff's blood sugar level could be checked each week. As a result of the call, the plaintiff's blood sugar level was tested on four occasions in October of 2007 and the results were all within normal limits. (Def. Memo, Alex. Aff, p. 3)

Dr. Cullinan says on October 12, 2007, he was informed that the United States Marshall Service had requested blood sugar level tests for the plaintiff. Dr. Cullinan says he ordered a glycated hemoglobin test which measures the overall blood glucose control over the past two to three months. The plaintiff's blood was drawn on October 13, 2007 and analysis was completed at the Pekin Hospital lab. (Def. Mot, Cull. Aff, p. 4). Dr. Cullinan explains that results of less than 7 show a patient has maintained good control of his blood sugar level, from 7 to 9 shows average control and above 9 shows poor control. The plaintiff's results were 7.2, so he maintained average control of his blood sugar. (Def. Mot, Cull. Aff, p. 4)

3

Dr. Cullinan states that common symptoms of diabetes include frequent urination, excessive thirst and hunger, unusual weight loss, increased fatigue, irritability and blurry vision.

> The plaintiff presented with non of these symptoms. Moreover, the results of the myriad of Accu Checks and the glycated hemoglobin test led me to believe the Plaintiff did not suffer from diabetes. (Def. Mot, Cull. Aff, p. 4)

On October 24, 2007, the plaintiff yelled at Dr. Cullinan that he needed an inhaler. The doctor informed the plaintiff that he would not be provided an inhaler because he did not have any asthma symptoms.

On October 26, 2007, Dr. Cullinan was informed that the plaintiff had taken the cream prescribed for his skin condition and placed it inside the intercom in his cell. Based on his misuse, his medication was discontinued. On November 26, 2007, the doctor inquired about the plaintiff's skin condition. The doctor prescribed Prednisone for the plaintiff, but the plaintiff refused it. (Def. Mot, Cull. Aff, p. 4-5)

Dr. Cullinan says during his visit to the jail on December 10, 2007, he refused to see the plaintiff due to his "disruptive behavior." (Def. Mot, Cull. Aff, p. 5) On January 6, 2008, Dr. Cullinan again saw the plaintiff and prescribed cream for his skin condition. The doctor noted the plaintiff's "history of non-compliance and refusing medication." (Def. Mot, Cull. Aff, p. 50

Dr. Cullinan says based upon his education, experience, training and review of the plaintiff's medical file, he believes the plaintiff received appropriate medical care in Tazewell County. In addition, the doctor says he has "no reasonable basis to believe the plaintiff suffered from either diabetes or asthma." (Def. Mot, Cull. Aff, p. 5).

Jeffery Dale says he is employed by the United States Marshal's Service and is a Supervisory Deputy. (Def. Memo, Dale Aff, p. 1). Gregory Sims says he has been employed as a Deputy United States Marshal for the past 15 years. (Def. Memo, Sims Aff, p. 1) The Marshal's Service has no federal facility for the incarceration of federal prisoners, therefore detainees awaiting trial are often held at the Tazewell County Jail. When a detainee is transported to court for a hearing, Tazewell County Deputies are responsible for the transport which takes approximately 20 minutes. Once at the courthouse, the prisoner is placed in the custody of the United States Marshal's Service. (Def. Memo, Dale Aff, p. 2) Dale says the Marshal's Service has no authority over the Tazewell County Jail. However, Dale says he is responsible for prisoner custody and ensuring that adequate medical care is offered to federal prisoners in the Peoria and Rock Island Divisions.

Dale says he believes the Tazewell County Jail is one of the better run jails in the area and prisoners are under the direct care and observation of medical personnel for 12 hours a

day with a nurse on duty. In addition, a nurse is on call overnight. (Def. Memo, Dale Aff. P. 3) Dale says he has had good experiences in his dealings with the medical department over the years. In addition, the jail "does not hesitate to move inmates to a hospital if the medical unit determines that such care is necessary." (Def. Memo, Dale Aff, p. 3) Dale says the jail does not need prior approval from the Marshal's Service for this transfer. Sims also states that he believes the jail "has the best medical care of any jail facility in the area." (Def. Memo, Sims Aff, p 2)

Dale says he visited the jail on occasion while the plaintiff as housed there and learned that the plaintiff was "disruptive; he often made loud, derogatory comments addressed to both staff and other inmates." (Def. Memo, Dale Aff, p. 4). Sims says one of the reasons the plaintiff was placed in the Tazewell County Jail is because the plaintiff had a reputation for disruption, manipulation of staff and filing frivolous complaints. "No other county facility would agree to house (the plaintiff)." (Def. Memo, Sims Aff, p 3).

Sims says on March 23, 2007, he attempted to explain to the plaintiff the rules at the Tazewell County jail, but the plaintiff refused to listen, "became quite volatile," and began to yell about his legal materials. (Def. Memo, Sims Aff, p 3)

Sims says on May 24, 2007, he met the Tazewell County jail's transport van and took custody of the plaintiff. The plaintiff showed no signs of having difficulty breathing and he did not complain about an asthma attack. The plaintiff did not ask for an inhaler, but instead was yelling that he did not have his legal papers. (Def. Memo, Sims Aff, p 3). Sims says he also heard the plaintiff complain that the heat in the van was deliberately turned up, but the plaintiff did not complain to the Deputy, nor did he claim it had any medical impact on him. Sims says the first he heard of this complaint was when he received a copy of the plaintiff's complaint in this case. (Def. Memo, Sims Aff, p 3)

The defendants have provided a transcript of the plaintiff's May 24, 2007 court hearing. The plaintiff spoke at length during the hearing and made his various complaints known to the court, but the plaintiff did not complain about his transport. The plaintiff did not claim that he had just suffered from an asthma attack. There is no indication in the record that anyone noted the plaintiff was suffering from any physical discomfort or distress, and the plaintiff was clearly able to speak and represent himself during the hearing (Def. Memo, Mary 24, 2007 Transcript).

Dale says on July 10, 2007, during a hearing in Federal Court, the jail superintendent testified about a June 30, 2007 incident in which guards used pepper spray against the plaintiff when he refused to follow an order. (Def. Memo, Dale Aff, p. 4). The presiding judge, United States District Court Judge Michael Mihm, asked Dale to see whether the plaintiff had an inhaler when he arrived at the jail and if so, why the prescription was not continued. Dale therefore made the calls to the jail and obtained the information requested.

5

Judge Mihm was provided with the medical information from the jail including information that the plaintiff had failed to comply with the peak flow test on two occasions. The plaintiff was informed that he could not complain that he was denied treatment if he refused to cooperate with tests to determine whether he should be treated for asthma. (Def. Memo, Dale Aff, p. 7)

Dale says he had several encounters with the plaintiff when he appeared in Federal Court and the plaintiff directed numerous complaints to both the judge and to Dale outside the presence of the Judge. "These complaints were usually about his legal records and I do not recall that he ever complained to me that his alleged asthma went untreated until after he had been offered and refused to take the peak flow test." (Def. Memo, Dale Aff, p. 5-6).

Dale says on one occasion when the plaintiff complained that his legal work arrived late, he threatened to sue Dale. The plaintiff also complained that someone tampered with his lunch on one occasion. While Dale saw no evidence of tampering, the plaintiff was provided a new lunch. (Def. Memo, Dale Aff, p. 7)

Dale says he is familiar with asthma and the symptoms of asthma attacks since he has a close relative who suffers from asthma attacks. (Def. Memo, Dale Aff, p. 5) Dale says he never observed the plaintiff demonstrating any breathing difficulty.

> (The plaintiff's) complaints to me that the Tazewell County jail failed to provide him proper medical care were informal and occurred after the Tazewell County jail medical staff had offered the peak flow test to determine the nature and extent of (the plaintiff's) asthma, if any. The vast majority of Fletcher's expressed complaints were with respect to his legal paperwork. (Def. Memo, Dale Aff, p. 7)

Steven Deathridge is the United States Marshal for the Central District of Illinois. Deathridge says he was in court on a couple of occasions with the plaintiff. The only personal conversation he recalls with the plaintiff was in an elevator when the plaintiff spoke about the weather. Deathridge says he is certain the plaintiff did not know his identity. Deathridge says on no occasion did he hear anything that would lead him to believe the plaintiff was denied medical care. (Def. Memo, Deathr. Aff.)

Robert Huston says he is the Sheriff of Tazewell County and serves as the Warden of the Tazewell County Jail. Huston says he does not "practice any direct or personal supervisory duties over jail detainees." (Def. Memo, Huston Aff, p. 1). Huston says he has never met the plaintiff, nor has he had any personal contact with the plaintiff. In addition, Huston says he has never known of any medical need of the plaintiff's while he was in the jail, nor any claim that he was denied treatment. (Def. Memo, Huston Aff.)

6

Earl Helm says he is the Tazewell County Jail Superintendent. Helm also says he is not involved in the day-to-day care taking of jail detainees. Helm says he was never aware that the plaintiff suffered from any serious medical condition, nor that he was denied medical treatment. (Def. Memo, Helm Aff.) Both Huton and Helm say medical care is provided "as determined by contracted healthcare professionals. " (Def. Memo, Helm Aff, p. 1).

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

### IV. ANALYSIS

The defendants argue that the plaintiff has failed to demonstrate that any defendant violated his Eighth Amendment rights. The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently

7

serious. *Id*. The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997). Deliberate indifference is "something approaching a total unconcern for [the plaintiffs'] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v Lane,* 959 F.2d 673, 677 (7th Cir. 1992).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6. However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The court does not believe the plaintiff has demonstrated that he suffered from a serious medical condition. There is no evidence before this court that the plaintiff ever suffered from asthma or diabetes. Even if the plaintiff could somehow demonstrate he suffered from a serious medical condition, there is even less evidence that any defendant in this case was deliberately indifferent to his medical condition. The plaintiff was repeatedly seen by medical personnel who continued to monitor his condition and provided various tests to check on both the plaintiff's blood sugar level and breathing ability. No test showed the plaintiff to suffer from asthma or diabetes.

In his responses to the summary judgement motion, the plaintiff continues to argue claims that are not before the court. As the court clearly stated in its October 1, 2007 merit review order, the plaintiff's only surviving claim is that he suffered from asthma and received no medical care. There are no claims involving diabetes, a skin condition, retaliation or a false disciplinary ticket before this court. *See* October 1, 2007 Court Order. The court notes that the plaintiff made no mention of his skin condition in any of his three complaints, and his only mention of diabetes was his claim that staff was not checking his blood sugar levels. The

plaintiff made no specific claims of harm. Even if these claims were before the court, the plaintiff has failed to demonstrate he suffered from a serious medical condition or that any defendant was deliberately indifferent to his condition.

The plaintiff also argues he had been prescribed an inhaler at the McLean County jail, but the Tazewell County Defendants confiscated the inhaler. The plaintiff also claims his asthma attacks were at night when no nurse was on duty. The plaintiff offers no evidence in support of this claim. There are no reports from jail officers at night, no referrals to medical staff, no requests to see medical staff and absolutely no evidence to support the plaintiff's claim that he suffered from asthma during his time at the Tazewell County jail.

The court has reviewed the medical records presented by the plaintiff in response to the dispositive motion. The records date from May 18, 2007 to January 7, 2008. (Plain. Resp, Med. Rec.) During this nearly eight month time period, there are approximately 75 medical notations of the plaintiff's various complaints and medical treatment. On only one occasion, June 13, 2007, the plaintiff claimed he had an asthma attack the previous night. Nonetheless, the plaintiff showed no signs of suffering from any breathing problems. In addition, the medical records demonstrate the plaintiff repeatedly verbally abused the nursing staff with comments such as "fucking bitch," "fat ass," and "stupid bitch," to name a few. (Plain. Resp, Med Rec)

In his response, the plaintiff also claims Defendants Malavoti and Szadkowski exposed him to severe, 100 degree heat during his transport to the Federal Courthouse on May 24, 2007. The plaintiff stated that he "suffered a severe asthma attacks in said transfer van..." (Plain. Resp, p. 12). Again, there is not a scintilla of evidence to support of this claim. It is ludicrous for the plaintiff to maintain he suffered from a severe asthma attack, but then was still able to speak clearly and at length during the court hearing after his transport. In addition, the plaintiff had no problems voicing his complaints to the court during the hearing, but made no mention of an asthma attack.

The court also notes that some of the named defendants such as Deathridge, Huston and Helm appear to have no personal involvement in the plaintiff's Eighth Amendment claim. A defendant cannot be held liable under 42 USC §1983 unless the plaintiff can demonstrate that the defendant's caused or participated in the alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). Also, the mere fact that an individual was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983. *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). A supervisor cannot be held liable for the errors of his subordinates.

In addition, administrators usually have no medical expertise and therefore must rely on health care professionals to assess the needs of prisoners and initiate treatment. *McEachern v. Civiletti,* 502 F.Supp. 532, 534 (N.D.Ill.1980). The defendants motions for summary judgement are granted.

## V. COSTS

This plaintiff has already accumulated three strikes pursuant to 28 U.S.C. §1915(g). *See Fletcher v Epperson,* Case No. 03-2020; *Fletcher v. Bankston,* Case No. 07-1051 in the Central District of Illinois and *Fletcher v Urban,* Case No. 96-2442 in the Northern District of Illinois. Nonetheless, the plaintiff continues to file multiple lawsuits in the Central District of Illinois. *See* 07-1051, *Fletcher v Emery;* 07-1072, *Fletcher v Dozier;* 07-1080, *Fletcher v. City of Bloomington;* 07-1228, *Fletcher v. Huston;* 07-1245, *Fletcher v. Deathridge;* 07-1246, *Fletcher v. Huston;* 08-1158, *Fletcher v. Menard;* 09-1024, *Fletcher v. Mathey;* and 09-1142, *Fletcher v. Mathey*

In this case, the court noted in its merit review order that the attachments to the plaintiff's complaint were not very support of his claim. October 1, 2007 Court Order, p.3. Nnetheless, the court could not say the attachments wholly contradicted the plaintiff's allegations and allowed the plaintiff to proceed with his claim that he had severe asthma attacks and was not receiving medical care.

The evidence now before the court shows the plaintiff did not suffer from severe asthma attacks, and did not suffer from asthma at all during his stay in the Tazewell County Jail. The plaintiff refused testing and was abusive to medical staff. When medical testing was done, every test showed the plaintiff had no breathing difficulties. Nonetheless, the plaintiff aggressively pursued his claims filing numerous motions [d/e 11, 12, 13, 31, 37, 39, 40, 47, 54, 56, 57, 61, 68, 71, 77, 78, 90] including four motions to compel. [d/e 54, 61, 77, 78]. At one point, the court advised the plaintiff that if he continued to "file motions to compel in violation of the Federal Rules of Civil Procedure, sanctions will be imposed against the plaintiff." May 29, 2009 Case Management Order #3. Each of these motions demanded time, attention and expense from the defendants.

Therefore, although this court does not normally assess costs against a pro se prisoner who was allowed to proceed *in forma pauperis,* the court believes that assessment of costs is warranted in this case. The power to award costs is a discretionary function of the court. *McGill v Faulkner*, 18 F.3d 456, 460 (7th Cir. 1994). "A plaintiff's indigency...., does not require the court to automatically waive costs to an unsuccessful litigant." *McGill,*18 F.3d at 459.

The court notes that the statute dealing with *in forma pauperis* status expressly allows the awarding of costs at the conclusion of the lawsuit. 28 U.S.C. §1915 (f). In fact, § 1915(f)(2)(A) clearly states that "[i]f the judgment against a prisoner includes the payment of costs under this subsection, the prisoner shall be required to pay the full amount of the costs ordered." The Seventh Circuit has further elaborated that plaintiffs such as Mr. Fletcher:

> should not be shielded from the costs he forced the defendants to incur with
> his suit even if he was and is presently indigent. Just as non-indigent litigants
> must consider the relative merits of their lawsuit against the pain an unsuccessful
> suit might inflict on their pocketbook, so must prisoners (like the plaintiff) learn

to exercise discretion and judgment in their litigious activity and accept the
consequences of their costly lawsuits. The imposition of costs against an
unsuccessful litigant is analogous to a court ordering a criminal defendant to
make restitution to his victim because the award of costs and restitution are both
designed to compensate wronged parties either during or after imprisonment if
in fact he is confined. *Id.* at 460.

The court further notes that even though the plaintiff may still be indigent, the payment provisions of 28 U.S.C. § 1915(f)(2)(B) provide for the same monthly installment procedure used to collect the filing fee. Since the state is providing for the plaintiff's basic necessities, his "indigency is effectively mitigated." *Singleton v. Smith*, 241 F.3d 534, 540 (6th Cir. 2001).

**ITS IS THEREFORE ORDERED that:**

> **1) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 72, 73, 80]. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff, together with costs of suit. This case is terminated.**
>
> **2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. See Fed. R. App. P. 24(a)(1)c. If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**
>
> **3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**
>
> **4) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**
>
> **5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

**6) The court will order the plaintiff to pay the defendants' costs in this case pursuant to *McGill v Faulkner*, 18 F.3d 456 (7th Cir. 1994) and 28 U.S.C. §1915(f)(2)(A).**

**7) The defendants are ordered to provide the court with a Bill of Costs within 21 days of this order**.

Entered this 17th day of August, 2009.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE